UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARJEET SINGH, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>BLACKLANE NORTH AMERICA INC.,<br><br>   Defendant. | Case No. 24-cv-07129-RFL<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION AND STAYING PROCEEDINGS**<br><br>Re: Dkt. Nos. 28, 30 |

   Plaintiffs Harjeet Singh and Jasbir Singh filed this putative class action, on behalf of a class of California limousine drivers, against Defendant Blacklane North America Inc., alleging that Blacklane misclassified Plaintiffs and the putative class members as independent contractors even though they are employees under California law. (Dkt. No. 1, ("Compl.").) Plaintiffs bring various claims for breach of California labor law. Blacklane previously moved to compel arbitration, arguing that both Plaintiffs agreed to the terms of use on its Chauffeurs App ("Terms of Use"), which includes an arbitration agreement. (Dtk. No. 17.) The motion was denied without prejudice, and Plaintiffs were granted limited discovery regarding the notice of the Terms of Use. (Dkt. No. 25.) After discovery concluded, Blacklane renewed its motion to compel arbitration and stay proceedings. (Dkt. No. 28, ("Motion").) Because Blacklane has shown, by a preponderance the evidence, the existence of a valid, enforceable agreement between itself and Plaintiffs that covers the claims at issue, the Motion is **GRANTED**. This order assumes the reader is familiar with the facts of the case, the applicable legal standards, and the arguments made by the parties.

***Blacklane Has Shown That Plaintiffs Accepted the Terms of Use***.  Plaintiffs challenge the formation of a valid agreement, arguing that Blacklane has not shown that they accepted the terms of use.  (Dkt. Nos. 18, 29.)  Blacklane has met its burden of proof.  The record shows the following:

- Blacklane began rolling out the relevant version of its Terms of Use—which includes the arbitration agreement—in March 2024.  (Dkt. No. 17-1 at 10–21; Dkt. No. 28-2.)[1]  In a sworn declaration, Blacklane's Chief Technology and Product Officer asserts that the Terms of Use have "remained identical since at least March 2024."  (Dkt. No. 17-1 at p. 4 ¶ 20.)
- On March 13, 2024, Blacklane sent an email to Plaintiffs advising them of the Terms of Use rollout, and that acceptance would be mandatory if they wished to continue to use the Chauffeurs App.  (Dkt. No. 19-1 at p. 2 ¶ 7 & p. 5; Dkt. 17-1 at p. 7 ¶¶ 34–35.)
- Starting on April 8, 2024, a Chauffeurs App update became available, and once installed, it blocked drivers from using the app until they accepted the Terms of Use.  (Dkt. 19-1 at p. 2 ¶¶ 8–9.)  When drivers opened the updated app, a pop-up notification would appear, stating: "Accept Blacklane's Terms & Review Privacy Notice[.]  By tapping 'I agree' below, I have reviewed and agree to the Terms and acknowledge the Privacy Policy[.]  I agree[.]" (Dkt. No. 28-2 at 18–19.)  The word "Terms" is underlined and in green font, indicating that it is a hyperlink. (*Id*.)  The hyperlink directed drivers to the Terms of Use.  (Dkt. No. 28-1 at 17.)
- The unique "chauffeur IDs" associated with Plaintiffs' driver accounts accepted the Terms of Use between April 14 and July 10, 2024.  (Dkt. No. 28-2 at 27–29.)

Rather than seeking to rebut Blacklane's evidence with contrary evidence, Plaintiffs primarily argue that the Court should infer that Blacklane has fabricated evidence based on

---

[1] All citations to page numbers refer to ECF pagination.

2

(1) redactions on certain documents produced by Blacklane; (2) the fact that Blacklane used a "mockup" rather than a "screenshot" to show how the pop-up notification would have appeared on Plaintiffs' cellphones; and (3) Blacklane's addition of the Terms of Use to the Onboarding FAQ section of its Partner Help page in October 2024.  (Dkt. No. 29.)  None of these arguments provide a basis to infer fabrication.  Plaintiffs were given the opportunity to conduct discovery.  (Dkt. No. 25.)  If they were skeptical of the evidence produced by Blacklane, they had the opportunity to explore any inconsistencies in Blacklane's sworn statements, discovery responses, and document production.  However, without more, none of the issues Plaintiffs have identified creates a genuine issue of material fact as to Plaintiffs' acceptance of the Terms of Use.  *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (summary judgment standard applies to the consideration of whether an agreement to arbitrate was formed).  Likewise, the fact that Plaintiffs state that they do not recall accepting the Terms of Use fails to create a material question of fact.  *See Whalen v. Facebook, Inc.*, No. 20-cv-06361-JST, 2022 WL 19934419, at *3 (N.D. Cal. Apr. 11, 2022).  Blacklane has shown, by a preponderance of the evidence, that Plaintiffs had adequate notice of the Terms of Use and that their acceptance was valid.  *See id.*

Plaintiffs also argue that the notice Blacklane provided was insufficiently conspicuous, and that it did not actually link to the Terms of Use.  (*See* Dkt. No. 29 at 7 ("[a]side from underlining the word 'Terms,' nothing in the message explains what those terms are or how to access them"); *id.* ("there is no evidence that th[e] page [containing the Terms of Use] existed" between April and July 2024).  Regarding the first issue, the word "Terms" appears directly above the "I agree" button, its text contrasts clearly with the background and stands out from the surrounding text, and it is plainly readable.  (Dkt. No. 28-2 at 18-19.)  *See Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 586–87 (N.D. Cal. 2020) (collecting cases finding similar notices sufficient).  Under such circumstances a reasonable cell phone user would understand that the word "Terms" was a hyperlink directing them to review an agreement prior to pressing the "I agree" button.  *Id.*  Notice was sufficiently conspicuous.  Second, Blacklane has provided evidence that its pop-up notification directed to the Terms of Use that are in the record.  (*See*

3

Dkt. No. 17-1 at 5 ¶¶ 19-20; Dkt. No. 19-1 ¶¶ 3 –7; Dkt. No. 28-1 at 17 (during the relevant period, the "Terms" hyperlink "directed to a webpage located within Defendant's Partner Help Center" containing the Terms of Use).)  Plaintiffs have identified no contrary evidence, other than their own statements that they do not recall seeing the notice of the Terms of Use.  However, as discussed above, this fact alone is insufficient to raise a material question of fact.  *Whalen*, 2022 WL 19934419, at *3.

***The Partner Contract Does Not Preclude Enforcement of the Arbitration Agreement***.  According to the evidence submitted by the parties, Blacklane does not employ drivers directly, it contracts with local service providers ("LSPs") to fulfill ride requests.  LSPs are required to sign a "Partner Contract," which is an agreement between a "Partner [] operating a Service business consisting of its own vehicles and drivers" and Blacklane.  (Dkt. No. 18-2 at 3.)  The Partner Contract does not purport to bind drivers.  Rather, the LSP is required to "inform, train, coach and instruct . . . the employees and/or drivers of the obligations and the terms and conditions as set forth [in the Partner Contract]."  (*Id.* § 8.2.)  The Terms of Use, by contrast, is an agreement between the "Chauffeur[]" and Blacklane, and governs the "use of the BL Chauffeur Tools" that drivers use to provide rides to end users on behalf of the LSP.  (Dkt. No. 17-1 at 10.)

Plaintiffs argue that there is a no-modifications clause in the Partner Contracts that "preclude[s] Blacklane from unilaterally modifying the terms of their relationship" via the later Terms of Use.  (Dkt. No. 18 at 12; Dkt. No. 18-2 § 20.2.)  However, the Partner Contract does not control here, because it governs a separate contractual relationship—between the LSP and Blacklane—while the Terms of Use is an agreement between individual drivers and Blacklane.  The evidence in the record supports the separateness of the two agreements.  While Plaintiffs each signed a Partner Contract, they did so on behalf of an LSP, and not in their individual capacity.  Jasbir signed a Partner Contract with Blacklane on behalf of A1 Limo.  (Dkt. No. 18-2 at 3–13.)  Harjeet signed a Partner Contract with Blacklane on behalf of Legend Limo.  (Dkt. No. 17-1 at p. 6 ¶ 25.)  Blacklane has submitted unrebutted evidence that Legend Limo has retained

4

more than 15 drivers, including Harjeet, and that A1 Limo has retained at least one other driver in addition to Jasbir. (Dkt. No. 17-1 ¶¶ 26–27, 31.)

In other words, Plaintiffs could have entered into the Partner Contract on behalf of the LSP without becoming drivers themselves, and could have agreed to the Terms of Use without signing a Partner Contract (much like the other Legend Limo and A1 Limo drivers presumably have done). Therefore, based on the record, the Partner Contract and the Terms of Use are independent agreements that serve separate purposes. The former governs the terms under which the LSPs provide services to Blacklane, and the latter governs the relationship between individual drivers and Blacklane. Therefore, the Terms of Use cannot be an improper "modification" of the Partner Contract because they are separate, independent agreements. *See Johnson v. Walmart Inc.*, 57 F. 4th 677, 683 (9th Cir. 2023) (finding that agreements that differed substantially in their terms and services and involved separate consideration were "separate, independent agreements").

***The Federal Arbitration Act's Transportation Worker Exemption Does Not Apply.*** Plaintiffs argue that even if the Terms of Use are a valid agreement, the FAA's transportation worker exemption applies, rending the agreement unenforceable. (Dkt. No. 30-1 at 6.)[2] But Plaintiffs have not carried their burden of showing that they are of a "class of workers engaged in interstate commerce." *See Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024) ("As the party opposing arbitration, plaintiffs bear the burden of establishing that the exemption applies.").

Section 1 of the FAA, the transportation worker exemption, exempts from the FAA's coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.[3] In determining the applicability of

---

[2] Plaintiffs' motion to file a supplemental brief and declarations (Dkt. No. 30) is granted.

[3] Because, as explained below, Plaintiffs have failed to establish that they are of a "class of workers engaged in interstate commerce," this order does not reach the insufficiently briefed question of whether the Terms of Use constitute a contract for employment. This order also does not reach the question of whether Plaintiffs are "transportation workers."

the exemption, "the question is not whether the *individual worker* actually engaged in interstate commerce, but whether *the class of workers to which the complaining worker belonged* engaged in interstate commerce." *Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 861 (9th Cir. 2021) (cleaned up) (emphasis in original). Where, as here, the record indicates that the class of workers operates nationwide, the Court must "assess the relevant 'class of workers' . . . at the nationwide level" regardless of the geographic scope of the putative class. *Id.* at 862.

Plaintiffs point to their airline-related bookings as evidence of the applicability of the exception. The record shows that Emirates Airlines provides "complimentary Chauffeur-drive services to [] First and Business Class customers in over 75 cities worldwide" through a partnership with Blacklane. (Dkt. No. 30-3 at 7.) Blacklane fulfilled rides can be booked directly through the Emirates website. (*Id.* at 11.) San Francisco and Los Angeles are cities in which the service is available. (*Id.* at 11, 15.) Both Plaintiffs state that a "substantial portion" of the rides they complete "are booked by Emirates Airlines passengers directly through Emirates." (Dkt. No. 30-2 ¶ 11; Dkt. No. 30-3 ¶ 11.) However, there is no evidence in the record of the overall percentage of Blacklane rides nationwide booked through Emirates or other airlines, nor is there any information about whether Blacklane offers rides to Emirates passengers in other U.S. cities.

Plaintiffs argue that in performing the first or final leg of interstate and international journeys, for Emirates passengers, they are "engaged in interstate commerce" within the meaning of Section 1, much like the drivers in *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020). (Dkt. No. 30-1 at 9–11.) In *Rittmann*, the Ninth Circuit found that Amazon delivery drivers "mak[ing] 'last mile' deliveries of products from Amazon warehouses to the products' destinations" were engaged in interstate commerce. 971 F.3d at 907, 919. The Ninth Circuit reasoned that "even if [the delivery drivers] do not cross state lines to make their deliveries," they were "part of a process by which [Amazon] transfers the packages to a different vehicle for the last mile of the packages' interstate journeys." *Id.* at 916, 919. On the flipside, Plaintiffs seek to distinguish *Capriole v. Uber Techs., Inc.*, 7 F.4th 854 (9th Cir. 2021). In *Capriole*, the

Ninth Circuit declined to find the transportation worker exception applicable to Uber drivers. While there was evidence in the record of a contract between Uber and one airline that allowed airline passengers to book their flight and ride together, there was "no evidence that Uber exclusively contracted with airlines such that its drivers would 'serve only airport passengers' or otherwise participate in a single, unbroken stream of interstate commerce." *Id.* at 864–65 (quoting *United States v. Yellow Cab Co.*, 332 U.S. 218, 231 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)) (cleaned up).

Plaintiffs have not carried their burden to show that the class of workers to which they belong is engaged in interstate commerce. This case is therefore unlike *Rittmann*, where the evidence showed that, as a class, Amazon delivery drivers participated in the last mile of Amazon's interstate deliveries because Amazon's products were almost exclusively shipped interstate. 971 F.3d at 915. Instead, this case is much more similar to *Capriole*, where drivers did perform airport rides but did not show those rides were a "central part of [Uber drivers'] job description." 7 F.4th at 865–66. In this case, Plaintiffs have not established that Blacklane drivers, as a class, are engaged in interstate commerce. The record indicates only that a "substantial portion" of the rides provided by Plaintiffs themselves, without specifying any estimated percentage, involve passengers from Emirate flights. But, as *Capriole* explains, this is not enough for Plaintiffs to carry their burden of proof to show the application of the interstate commerce exception to the class of drivers to which they belong.

*The Terms of Use Contain a Valid Arbitration Provision and Plaintiffs' Claims Are Within Its Scope.* As explained above, Blacklane has shown that Plaintiffs affirmatively accepted the Terms of Use after receiving adequate notice. The Terms of Use contain an arbitration provision that expressly covers "all claims, causes of action, charges, complaints, disputes or controversies" arising out of "your engagement to provide the Services on the Local Service Provider's behalf," including "employment or wage claim[s] against the Local Service Provider or Blacklane," "regardless of whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to these Terms." (Dkt. No. 17-1 at 11.) It further

7

provides that arbitration is the "sole and exclusive remedy and forum for all such Claims." (*Id.*) Plaintiffs do not dispute the scope of the arbitration provision covers their claims. Therefore, Blacklane has shown that Plaintiffs agreed to arbitrate their California labor law claims.

*Conclusion*. For the foregoing reasons, Blacklane's Motion to Compel Arbitration and Stay Proceedings (ECF No. 28) is **GRANTED**. Plaintiffs' motion to file a supplemental brief and declarations (Dkt. No. 30) is also **GRANTED**. All claims are stayed pending resolution of the arbitration. The parties shall file a joint report every 180 days to update the Court on the arbitration proceedings, starting from the date of this Order, and within 14 days of the arbitration proceedings' completion.

**IT IS SO ORDERED.**

Dated: October 7, 2025

RITA F. LIN
United States District Judge